RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0428p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ALTON HIGGINS,

　　　　　　　*Petitioner-Appellee,*

　　　*v.*

PAUL RENICO,

　　　　　　　*Respondent-Appellant.*

No. 05-1564

>

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 02-10124—David M. Lawson, District Judge.

Argued: September 20, 2006

Decided and Filed: November 20, 2006

Before: CLAY and GILMAN, Circuit Judges; STAFFORD, District Judge.[*]

---

## COUNSEL

**ARGUED:** William C. Campbell, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Chaundra C. King, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** William C. Campbell, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Chaundra C. King, Howard J.C. Nicols, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

　　　　STAFFORD, District Judge. Respondent, Paul Renico ("Renico"), appeals a conditional grant of habeas corpus relief to Petitioner, Alton Higgins ("Higgins"), under 28 U.S.C. § 2254. We **AFFIRM.**

---

[*] The Honorable William H. Stafford, Jr., United States District Judge for the Northern District of Florida, sitting by designation.

# I. BACKGROUND

On April 3, 1995, Alvin Ramsey ("Ramsey") was shot to death as he sat in the driver's seat of a car parked in a Detroit neighborhood. Alton Higgins ("Higgins") was one of three people sitting with Ramsey in that automobile at or near the time Ramsey was shot. Another of those three people, Michael Adams ("Adams"), exited the vehicle and fled on foot before shots were fired, leaving Higgins, Ramsey and Wayne Young ("Young") in the car.

Not long after the shooting, 16-year-old Young, wearing a green jacket, surrendered to the police while the police were canvassing the neighborhood. The police were looking for Young because "word on the street" was that Young was the shooter and because a witness had reported that a black male wearing a green jacket was seen running from the car after two shots were fired. Although he denied shooting Ramsey, Young admitted that he had been in the car with Ramsey, sitting next to him in the front passenger seat, when a guy sitting in the rear seat behind Ramsey put a gun to Ramsey's neck. Identifying the man in the rear seat only as "211," Young explained that he did not know the man's real name. In his own words, Young continued: "I got out and started running. I heard one shot as I turned the corner I heard a second shot." J.A. Supp. at 2.[1] When asked specifically where he was when he heard the shots, Young said: "First time I had just got out the car. The second shot when I was on the side of the house." *Id.* at 3. When asked if he saw the shooting, Young replied: "I only heard the shots." *Id.* The police took forensic samples from Young's hands and thereafter released him from custody. Those forensic samples, the results of which were not known until after Higgins was charged with murder, showed that Young had gunpowder residue on both hands.

The next day, April 4, 1995, Higgins was questioned about the shooting. In a nutshell, Higgins denied shooting Ramsey. According to Sergeant Ralph Openshaw (who related Higgins's statement at trial), Higgins said that he, Young, Adams, and some other friends were sitting on a front porch discussing who might have some guns for sale when Young suggested that Ramsey (then sitting in a car on the street in front of them) possibly had guns for sale. Higgins said that, when he and Young approached Ramsey, Ramsey indeed stated that he would sell a .25 caliber gun that he had at his house. According to Higgins, Young returned to the porch and told his friends that he was going to purchase the gun for money and possibly some fake cocaine. Higgins told Openshaw that Young, having seen that Ramsey was armed, armed himself with a .45 caliber or .9 mm handgun. Higgins admitted that he and Young walked down the street to Ramsey's house, where Ramsey retrieved a .25 caliber gun, then fired a shot into the air to show Young and Higgins that the gun was, in fact, operable and in good condition. Higgins said that the men then got into Ramsey's car to negotiate the price of the gun. According to Higgins, Young was sitting in the rear seat behind Ramsey; Higgins was sitting in the right front passenger seat next to Ramsey. Higgins said that, after they completed their negotiations, Young asked Ramsey to drive back down the street. As Ramsey started to drive, Young pulled a gun from his coat and said: "We want everything you got." Higgins told Sergeant Openshaw that he (Higgins) jumped out of the car before he heard two shots and before he saw Ramsey's car hit a van parked on the side of the street.

Later that same day, April 4, 1995, Young was shown Sergeant Openshaw's report of Higgins's statement. After seeing that report, and after hearing that he would get life in jail if he refused to say who shot Ramsey, Young admitted that he knew the name of the man who shot Ramsey. That man, according to Young, was Alton Higgins. Young went on to explain:

---

[1] Three Joint Appendices were filed and will be referred to as follows: Joint Appendix ("J.A."), Supplemental Joint Appendix ("Supp. J.A."), and Joint Appendix Supplement ("J.A. Supp.").

> When I saw Alton pull a gun out of his coat and put it to Mr.
> Ramsey's neck, Mike [Adams] jumped out of the car. Alton said:
> "Give me the .32." Mr. Ramsey opened his door and put the car in
> drive, and Alton hit him on the back of his head with the gun. I
> jumped out of the car and heard a gunshot coming from within the
> car. I started running to the vacant house on Coplin . . . with Mike.
> As I started to run I heard a second shot coming from out of the car.

J.A. Supp. at 6.

Two weeks later, on April 17, 1995, Young testified at a preliminary hearing on the murder and robbery charges then lodged against Higgins. Higgins's counsel, Walter Pookrum ("Pookrum"), was present at the preliminary hearing and questioned Young. Young again said that he was not in the vehicle at the time of the shooting, that only Higgins and Ramsey were in the car when he (Young) heard two shots fired. When asked where he was when he heard the shots, Young replied: "My sister's driveway." J.A. at 200. At the time of the preliminary hearing, Pookrum did not have copies of Young's prior statements, and the result of the forensics test of samples taken from Young's hands was still not known. Indeed, the result of the forensics test was not known until August of 1995.

Higgins was charged with felony murder/larceny, armed robbery, and possession of a firearm during the commission of a felony. At trial, the medical examiner testified that Ramsey died almost immediately as a result of a single gunshot through the back of his neck that exited just below the collarbone in the area of his right shoulder. When asked whether he could determine if the firing was close-range, the medical examiner replied: "There was no evidence of any close range on the skin." J.A. at 131. A police officer later testified that gun residue was found on the hands of both Ramsey and Young.

Over Pookrum's objection, Young's preliminary hearing testimony was read into the record at trial after Young failed to appear on the day he was subpoenaed to testify. The trial court found that Young was "deliberately evading" and was, therefore, unavailable.

On the fourth day of trial, Young was located. He testified on direct that he had been threatened by telephone and in writing not to testify in the case. He did not say who had threatened him. He also testified that, while Higgins was sitting in the rear of the automobile behind Ramsey, Ramsey handed Higgins the .25 caliber handgun, without a clip. When the prosecutor asked him what happened after Higgins was given the .25 caliber gun, Young responded: "So after [Higgins] got the .25 in his hand, I pulled – he pulled out the .45, saying give it up." J.A. at 165. According to Young, Ramsey tried to get out of the car, but Higgins shot him before he could escape. Young denied that he had fired any of the guns that day.

Pookrum did not anticipate Young's appearance on the last day of trial. He therefore asked that he be given until after the lunch hour to review Young's two sworn statements and preliminary hearing testimony in order to prepare for his cross-examination. Inexplicably, Pookrum had not reviewed Young's prior statements before Young appeared in court. When the trial court agreed to give him only a brief period of time to prepare, Pookrum declined to do any cross-examination at all. As he explained in open court: "Well, I'm not ready to cross-examine this man. . . . It will be malpractice for me to proceed." J.A. at 275. Thus, the only person who directly implicated Higgins as Ramsey's killer was never cross-examined in front of the jury.

After the jury returned guilty verdicts on all three counts, Higgins was sentenced to two concurrent terms of life imprisonment for first-degree felony murder and armed robbery plus two years' imprisonment for a felony firearm conviction.

While the case was on appeal, new appellate counsel filed a motion to remand so that he could file a motion in the trial court for a new trial based upon an affidavit by Young in which Young recanted his trial testimony. The motion to remand was granted, but Young failed to appear at the hearing on Higgins's motion for new trial. The trial court accordingly dismissed the motion for new trial, and the case was returned to the court of appeals.

Among other things, Higgins argued on direct appeal that "[t]rial counsel's lack of preparation and refusal to cross-examine the prosecution's key witness deprived Mr. Higgins of the effective assistance of counsel and a fair trial." J.A. at 238. In an opinion dated March 30, 1999, the state court of appeals affirmed Higgins's felony murder and felony firearm convictions but vacated his conviction and sentence for armed robbery. *People v. Higgins*, No. 195865, 1999 WL 33451714, at *3 (Mich. Ct. App. March 30, 1999) (unpublished decision); Supp. J.A. at 89. In rejecting Higgins's ineffective assistance of counsel claim, the state court of appeals wrote:

> Finally, defendant contends that he received ineffective assistance of counsel. Specifically, defendant contends he was denied a fair trial when his counsel refused to cross-examine Young. We disagree. "To prove a claim of ineffective assistance of counsel . . . a defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense so as to deny defendant a fair trial." *People v. Smith*, 456 Mich. 543, 556; 581 N.W.2d 654 (1998). We conclude that defendant has failed to establish that he was denied effective assistance of counsel because he is unable to show that he was prejudiced by counsel's inaction.

*Id.* On November 29, 1999, the Michigan Supreme Court denied Higgins's application for leave to appeal the appellate decision of March 30, 1999. *People v. Higgins*, 604 N.W.2d 681 (Mich. 1999); Supp. J.A. at 90. On February 29, 2000, the Michigan Supreme Court denied Higgins's motion for reconsideration. *People v. Higgins*, 609 N.W.2d 189 (Mich. 2000); Supp. J.A. at 91.

Higgins thereafter filed a motion for relief from judgment, including among his seventeen claims for relief the following: "Defense counsel denied defendant of [sic] his right to effective assistance of counsel where he failed to effectively cross-examine the sole prosecution eyewitness and denied defendant of [sic] his right to confrontation and a fair trial." J.A. at 33. The trial court denied Higgins's motion for post-conviction relief, and Higgins was thereafter denied leave to appeal by the Michigan Court of Appeals and the Michigan Supreme Court.

On May 10, 2002, Higgins filed a petition for habeas corpus relief in federal court. Included among his many claims for relief was the following: "Petitioner Alton Higgins was denied the effective assistance of (trial) counsel in violation of the United States Constitution's Sixth Amendment. . . . Counsel's failure to prepare/investigate and abandonment of his duty to cross-examine Wayne Young denied petitioner his constitutional rights to due process and to confront his accuser." J.A. at 64, 68. In his response to Higgins's petition, Renico did not argue that Higgins's failure-to-cross-examine claim was procedurally defaulted. Indeed, given the state court record, such an argument would not succeed.

The district court found merit to only one of Higgins's claims—his claim that, by abandoning the duty to cross-examine the key, and only, eyewitness against Higgins at trial, Pookrum violated his client's Sixth Amendment right to the effective assistance of counsel. Noting that the state courts

made no finding under the performance prong of the *Strickland*[2] test for ineffective assistance of counsel, the district court evaluated Pookrum's performance *de novo*, finding that "[t]he failure of counsel to participate in a critical phase of the trial, and to subject the State's case to meaningful adversarial testing, on the sole ground of lack of preparation, was not a reasonable strategic decision entitled to deference." J.A. at 286 (internal quotation marks and citation omitted). The district court thus found that Higgins's "trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms." *Id.*

The district court did not defer to the state courts' finding that Higgins failed to demonstrate prejudice, explaining that "[t]he State court of appeals' discussion of the prejudice prong of the *Strickland* test was truncated" and represented "an unreasonable application of Supreme Court precedent that has been clearly established for several years." J.A. at 289. Unlike the state courts, the district court found that prejudice clearly "inured to [Higgins] from his trial attorney's substandard performance." *Id.* Having determined that Higgins satisfied both prongs of the *Strickland* test for ineffective assistance of counsel, the district court ordered Renico to "release [Higgins] from custody unless the State brings him to trial again within seventy days." *Id.* at 303. Renico thereafter filed this timely appeal.

## II.  STANDARD OF REVIEW

The lone issue before this court is whether Higgins's Sixth Amendment right to the effective assistance of counsel was violated when his trial attorney failed to cross-examine the only eyewitness against him. We review *de novo* a district court's determinations concerning a habeas petitioner's ineffective assistance of counsel claim. *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir. 2002).

Because Higgins's habeas petition was filed after April 24, 1996, this court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). As amended, the AEDPA provides, in relevant part, that a federal court may not grant a petition for writ of habeas corpus unless the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Furthermore, state court determinations of factual issues are presumed to be correct unless the habeas petitioner rebuts this presumption of correctness by clear and convincing evidence.

In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor described the circumstances under which a federal habeas court may grant a writ of habeas corpus:

> Under the "contrary to" clause [of § 2254(d)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13 (Justice O'Connor's Part II majority opinion). Notably, an "unreasonable" application is an "objectively unreasonable" application. *Id.* at 409.

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

Where a state court does not evaluate the merits of a petitioner's federal claim, the deferential standard of review mandated by the AEDPA does not apply. As this court has previously explained:

> [The AEDPA] by its own terms is applicable only to habeas claims that were adjudicated on the merits in State court. . . . Where . . . the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply. Instead, this court reviews questions of law and mixed questions of law and fact de novo.

*Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (internal quotation marks and citations omitted); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reasoning that because no state court had reached the prejudice prong of the *Strickland* analysis, the Supreme Court's review of that issue was not circumscribed by a state court's conclusion with respect to that issue).

## III. DISCUSSION

In his brief before the state appellate court, Higgins argued his ineffective assistance claim as follows:

> The record reveals, clearly, that the trial counsel was deficient in his representation of Mr. Higgins. The key witness, Mr. Young, was the person who made the identification of Mr. Higgins as the shooter. Mr. Young had kept himself in hiding through the first days of the trial. Mr. Young had admitted to the initial plan to trick Mr. Ramsey and get his guns through the scam. Trial counsel refused to cross-examine Mr. Young, due to his counsel's apprehension that to do so would constitute malpractice, as he was admittedly unprepared (TT, vol. IV, p. 57). The reason for the failure to cross-examine was, thus, placed into the record. Even without counsel's express admission, it would be obvious that there could be no reasonable excuse or rationale or sound trial strategy for a failure to cross-examine the prosecution's key witness.
>
> . . . .
>
> . . . The failure to effectively cross-examine Mr. Young was a failure of the right to effective counsel; counsel failed to utilize the power of cross-examination when it counted: with the key witness. Instead, the jury was left with essentially unrebutted, and untested, testimony that Mr. Higgins had the gun and shot the victim. The evidence of Mr. Higgins's guilt was not overwhelming, and consisted of the testimony of Mr. Young; the prejudice to this defendant is obvious.

Supp. J.A. at 135-37.

Addressing this claim, without specifically citing any federal law, the state court of appeals set out the Supreme Court's *Strickland* test for ineffective assistance of counsel. Under *Strickland*, a defendant must establish both that his counsel's performance at sentencing was seriously deficient and also that he suffered prejudice as a result of such deficiency. *Strickland*, 466 U.S. at 687. Without discussion, the state appellate court made a determination, albeit conclusory, that Higgins suffered no prejudice as a result of his attorney's failure to cross-examine Young. This court must,

accordingly, review the state court's prejudice determination under the AEDPA's deferential standard. Because the state court did not address the performance prong of the *Strickland* test, this court considers *de novo* whether counsel's performance was seriously deficient.[3]

When complaining of his counsel's deficient performance, a convicted defendant must show that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms." *Strickland*, 466 U.S. at 688. A reviewing court must judge the reasonableness of counsel's actions on the facts of the defendant's case, viewed from counsel's perspective at the time, recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. In essence, a defendant has the burden of proving, by a preponderance of the evidence, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

"Because advocacy is an art and not a science, . . . [counsel's] strategic choices must be respected" if they were "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 681, 690. Such choices can vary greatly from attorney to attorney and from case to case, and reviewing courts must scrutinize these choices with a great deal of deference. Indeed, such strategic choices are virtually unchallengeable. *Id.* As explained by the Supreme Court:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689 (internal quotation marks and citations omitted). Thus, counsel cannot be adjudged ineffective for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy." *Id.*

In this case, Higgins contends that his trial counsel's failure to confront and cross-examine Young, the sole eyewitness to–and possible perpetrator of–the murder of Ramsey, had no tactical justification and, instead, amounted to constitutionally deficient performance. The district court agreed with this contention, explaining:

---

[3] Although the Supreme Court in *Strickland* discussed the performance prong of an ineffectiveness claim before the prejudice prong, the Court made clear that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. As the Court noted: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* It was thus entirely proper for the Michigan Court of Appeals to consider only *Strickland's* second prong, the prejudice prong, when evaluating Higgins's appeal.

> The record in this case . . . leaves no doubt about the reason for attorney Pookrum's failure to cross-examine the key prosecution witness in this case. He candidly admitted that he was not prepared to go forward, and when his request for more preparation time was denied, he blithely forfeited his client's right to confront Wayne Young and subject his direct testimony to cross-examination, "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) (quoting Wigmore, Evidence 1367). Finding that this decision on Pookrum's part was unreasonable creates no danger of trenching upon sound trial strategy after the fact, nor does it implicate the injunction that "an ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken." *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001). The failure of counsel to participate in a critical phase of the trial, and to subject the State's case to meaningful adversarial testing, on the sole ground of lack of preparation, "was not a reasonable strategic decision entitled to deference." *Moss* [*v. Hofbauer*, 286 F.3d 851, 864 (6th Cir. 2002)] (finding that defense counsel's reliance on the cross-examination of an eyewitness by a co-defendant unreasonable when the two defendants' interests were not aligned). The Court finds, therefore, that the petitioner's trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

*Higgins v. Renico*, 362 F. Supp. 2d 904, 916-17 (E.D. Mich. 2005).

A number of courts, including this one, have found deficient performance where, as here, counsel failed to challenge the credibility of the prosecution's key witness. *See, e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (finding ineffective assistance of counsel where, among other things, counsel's "failure to investigate prevented an effective challenge to the credibility of the prosecution's only eyewitness"); *Berryman v. Morton*, 100 F.3d 1089, 1099 (3d Cir. 1996) (finding deficient performance where counsel failed to raise the victim's prior inconsistent identification testimony, given that "[t]he reliability of this victim's uncorroborated identification of [the defendant] cut[] directly to the heart of the only evidence against [the defendant]"); *Tomlin v. Myers*, 30 F.3d 1235, 1238 (9th Cir. 1994) (finding deficient performance where counsel failed to challenge an eyewitness's in-court identification in a case that "hinge[d] on an eyewitness's testimony"); *Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir. 1989) (finding deficient performance where counsel failed to confront the prosecution's star witness with inconsistent statements, thus "sacrific[ing] an opportunity to weaken the star witness's inculpatory testimony"); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (finding deficient performance where counsel failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness's] testimony was the only plausible hope [the defendant] had for acquittal").

During arguments before this court, counsel for Renico suggested that Pookrum, an experienced attorney, chose not to cross-examine Young for tactical reasons, those reasons being that (1) Pookrum knew that Young had already said everything there was to say; and (2) Pookrum could see the handwriting on the wall, namely, that he was not going to prevail in the case. We find such explanation for Pookrum's conduct too implausible to accept. Indeed, we agree with the district court that there simply was no conceivable, tactical justification for Pookrum's failure to cross-examine *the* key witness in the case against Higgins. The district court correctly stressed that Young was not only the *sole* witness that directly implicated Higgins as the shooter, but he was also "a suspect whose interest in avoiding criminal culpability was tied firmly to convincing the police

and the jury that Higgins–and not Young himself–shot Ramsey." *Higgins*, 362 F. Supp. 2d at 918. Given the gun powder found on Young's hands, given the inconsistencies in Young's prior statements, given Young's slip-of-tongue during direct examination, and given Young's self-interest in the outcome of the case, Pookrum had plenty of ammunition with which to impeach Young's testimony. The need for such impeachment was compelling. Pookrum's decision to forego the opportunity to damage the credibility of the prosecution's only eyewitness to the crime amounted to a significant dereliction of duty. Under *Strickland*, Pookrum's performance was clearly deficient.

Even where counsel's performance is deficient, a petitioner is not entitled to habeas relief unless he also demonstrates ensuing prejudice. In evaluating the prejudice suffered by a defendant as a result of his counsel's deficient performance, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Indeed, "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* (citation omitted). Rather, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Although the defendant need not prove that counsel's deficient conduct more likely than not affected the verdict, the defendant must show that "absent his counsel's error, the courts of appeal would have reasonable doubt with respect to his guilt." *Moore v. Carlton*, 74 F.3d 689, 693 (6th Cir. 1996). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. In this vein, the court must determine whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*; *see also Kinnard v. United States*, 313 F.3d 933, 935 (6th Cir. 2002) (explaining that, when analyzing whether a defendant was prejudiced by his attorney's performance, "it is necessary to determine if the proceeding was fundamentally unfair or unreliable; a court should not focus the analysis on the outcome") (citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

Whether an error actually prejudiced a defendant is weighed against the "totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. A verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696; *see also Odem v. Hopkins*, 382 F.3d 846, 851-52 (8th Cir. 2004) (holding that prejudice was not shown where there was overwhelming evidence of guilt); *United States v. Bavers*, 787 F.2d 1022, 1030 (6th Cir. 1985) (finding no prejudice where there was overwhelming proof of the defendant's guilt).

Here, without Young's testimony, the State's case against Higgins was far from overwhelming. As the only eyewitness to events surrounding the murder, Young was the *key* to the State's case; yet Pookrum, who had the weapons to discredit Young, allowed Young's testimony to go unchallenged. Had the jury thought Young a liar and possibly himself the murderer, the jury may well have had reasonable doubt as to Higgins's guilt.

In our adversarial system of justice, a defendant's right to cross-examination is an essential safeguard of fact-finding accuracy. It is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). In this case, a case largely dependent on the testimony of one key witness, Higgins's right to that essential safeguard was denied by the hasty action of a lawyer who admitted that he was unprepared. That key witness was the lone eyewitness to the crimes charged. He was also a man who gave inconsistent stories to the authorities before trial; who was found with gun powder residue on his hands, yet denied *both* that he was in the car when shots were fired *and* that he himself shot a gun the day of the murder; who initially responded to the prosecutor's question about the murder weapon with "I pulled," then changed his response to "he pulled" out the .45; and who himself was a

possible perpetrator of the crime. Given the importance of the star witness's testimony, it is not difficult to imagine that the outcome of the trial was "unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland*, 466 U.S. at 696.

Renico maintains that the state appellate court rejected Higgins's ineffective assistance claim based on Higgins's failure to present the court with a well-developed argument regarding prejudice. As stated by Renico:

> Higgins's appeal claimed only that "prejudice to this defendant is obvious." Higgins failed to show the State court how he "would *probably* have won" if counsel had elected to cross-examine Wayne Young and the State court denied his claim on that basis. . . .
>
>         . . . Although Higgins made a general ineffective assistance of counsel claim, he did not base the claim on [] specific attorney errors.

Appellant's Br. at 19-20 (citations and footnote omitted) (emphasis in original). Renico urges this Court to defer to the state court's finding of no prejudice, based on the skeletal argument made by Higgins before that court.[4]

To be sure, it is the defendant's burden to "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. We are persuaded, however, that Higgins met such a burden before the state appellate court. Contrary to Renico's contention, Higgins was not required to demonstrate how he "would *probably* have won." He simply needed to present the factual basis for his contention that confidence in the outcome of his case was undermined by his counsel's deficient performance. Higgins did just that.

Higgins identified for the state appellate court the one critical error made by his attorney, and he identified some–albeit few–record facts to support his claim of prejudice. Specifically, he stated that his attorney failed to cross-examine the "key witness, Mr. Young, [] the person who made the identification of [M]r. Higgins as the shooter." Supp. J.A. at 135. Higgins went on to state that, by failing to cross-examine Young, his attorney left the jury "with essentially unrebutted, and untested, testimony that Mr. Higgins had the gun and shot the victim." *Id.* at 137. He pointed out that "[t]he evidence of Mr. Higgins' guilt was not overwhelming, and consisted of the testimony of Mr. Young;" and he argued that his "[c]ounsel 'dropped the ball' when it really mattered," *id.*, in effect providing Higgins with no defense at all. Higgins concluded his argument with the statement: "[T]he prejudice to this defendant is obvious." *Id.*; *see Berryman*, 100 F.3d at 1102 (finding prejudice to the defendant "obvious" where defense counsel failed to cross-examine an identification witness whose inconsistent identification testimony from previous trials could have raised questions in the minds of the jurors regarding the witness's credibility and/or ability to identify the defendant).

While Higgins presented his *Strickland* claim to the state appellate court in a skeletal manner, we think his presentation was sufficient to place the issue of prejudice squarely before that court. The state court nonetheless rejected Higgins's claim without discussion. As noted by the district court: "The State court of appeals' discussion of the prejudice prong of the *Strickland* test was

---

[4] In his brief before the district court, Renico responded to Higgins's *Strickland* claim as follows:
>         The Court of Appeals held that Petitioner failed to demonstrate how the errors he
>     attributes to his trial counsel actually prejudiced him to the extent that it
>     undermined the proper functioning of the adversarial process. Therefore, these
>     claims do not warrant habeas relief.

J.A. at 107.

truncated; that court simply stated that the petitioner failed to show prejudice." J.A. at 289. We assume, as did the district court, that the state court rejected–albeit in conclusory fashion–Higgins's prejudice claim on the merits. Like the district court, we think this rejection represents an "unreasonable application" of clearly established Supreme Court precedent. The state court may have correctly identified the governing legal principle from the Supreme Court's *Strickland* decision, but it unreasonably applied that principle to the facts of Higgins's case. Higgins is therefore entitled to conditional habeas relief.

## IV. CONCLUSION

For the reasons set out above, the district court's order and judgment are **AFFIRMED.**